UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| GENIFFER M. SILLETTA, | No. SA CV 11-789-PLA |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on May 27, 2011, seeking review of the Commissioner's denial of her application for Disability Insurance Benefits. The parties filed Consents to proceed before the undersigned Magistrate Judge on June 22, 2011, and March 1, 2012. Pursuant to the Court's Order, the parties filed a Joint Stipulation on January 20, 2012, that addresses their positions concerning the disputed issue in the case. The Court has taken the Joint Stipulation under submission without oral argument.

/

/

## II.

## **BACKGROUND**

Plaintiff was born on April 30, 1977. [Administrative Record ("AR") at 51, 56.] She has a high school education and past relevant work experience as a customer service representative, hairdresser, and receptionist. [AR at 134, 137.]

On August 24, 2007, plaintiff filed her application for Disability Insurance Benefits, alleging that she has been unable to work since June 30, 2006, due to psoriatic arthritis,[1] pain in her hands and knees, depression, and anxiety. [AR at 51, 56, 72-76, 122, 132-39, 172-77.] After her application was denied initially and on reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). [AR at 60-63, 71-76, 78-79.] A hearing was held on May 20, 2009, at which time plaintiff appeared with counsel and testified on her own behalf. [AR at 23-50.] A medical expert and a vocational expert also testified. [AR at 43-49.] On July 14, 2009, the ALJ determined that plaintiff was not disabled. [AR at 15-22.] On March 30, 2011, the Appeals Council denied plaintiff's request for review. [AR at 1-5, 11.] This action followed.

## III.

## **STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." Moncada, 60 F.3d at 523; see also Drouin, 966 F.2d at 1257. When determining whether substantial evidence exists to support the Commissioner's

---

[1] Psoriatic arthritis is also called psoriatic arthropathy. Dorland's Illustrated Medical Dictionary, at 151 (29th ed. 2000).

2

decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. Drouin, 966 F.2d at 1257; Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). Where the evidence is susceptible to more than one rational interpretation, the Court must defer to the decision of the Commissioner. Moncada, 60 F.3d at 523; Andrews v. Shalala, 53 F.3d 1035, 1039-40 (9th Cir. 1995); Drouin, 966 F.2d at 1258.

## IV.

## **THE EVALUATION OF DISABILITY**

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); Drouin, 966 F.2d at 1257.

**A.  THE FIVE-STEP EVALUATION PROCESS**

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995, as amended April 9, 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied. Id. If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied. Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. Id. If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has

sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled and the claim is denied. Id. The claimant has the burden of proving that she is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets this burden, a prima facie case of disability is established. The Commissioner then bears the burden of establishing that the claimant is not disabled, because she can perform other substantial gainful work available in the national economy. The determination of this issue comprises the fifth and final step in the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

### B.  THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS

In this case, at step one, the ALJ concluded that plaintiff has not engaged in substantial gainful activity since her alleged disability onset date, June 30, 2006. [AR at 17.][2] At step two, the ALJ concluded that plaintiff has the severe impairment of psoriatic arthropathy. [Id.] At step three, the ALJ determined that plaintiff does not have an impairment or a combination of impairments that meets or medically equals any of the impairments in the Listing. [AR at 19.] The ALJ further found that plaintiff retains the residual functional capacity ("RFC")[3] to perform "light work" as defined in 20 C.F.R. § 404.1567(b),[4] except that plaintiff is limited to "lifting and carrying 20 pounds occasionally, 10 pounds frequently; stand and walk for 6 hours out of an 8 hour day; sit for 6 hours out of an 8 hour day; occasionally climb, balance, stoop, kneel, crouch and crawl; no ladders; and no unprotected heights." [Id.] At step four, the ALJ concluded that plaintiff is capable of performing her past relevant work as a customer service representative, a

---

[2] The ALJ concluded that plaintiff meets the insured status requirements of the Social Security Act through December 31, 2011. [AR at 17.]

[3] RFC is what a claimant can still do despite existing exertional and nonexertional limitations. See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

[4] 20 C.F.R. § 404.1567(b) defines "light work" as work involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and requiring "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls."

cosmetologist, and a receptionist. [AR at 22.] Accordingly, the ALJ determined that plaintiff is not disabled. [Id.]

## V.

## **THE ALJ'S DECISION**

Plaintiff contends that the ALJ improperly rejected the opinions of plaintiff's treating physician. [Joint Stipulation ("JS") at 3-6.] As set forth below, the Court agrees with plaintiff and remands the matter for further proceedings.

In evaluating medical opinions, the case law and regulations distinguish among three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians). See 20 C.F.R. §§ 404.1502, 416.927; Lester, 81 F.3d at 830. Generally, the opinions of treating physicians are given greater weight than those of other physicians, because treating physicians are employed to cure and therefore have a greater opportunity to know and observe the claimant. Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007); Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); see also 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (more weight is generally given to the opinions of treating physicians because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.").

Where a treating physician's opinion does not contradict other medical evidence, the ALJ must provide clear and convincing reasons to discount it. Lester, 81 F.3d at 830; see also Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993) ("The administrative law judge is not bound by the uncontroverted opinions of the claimant's physicians on the ultimate issue of disability, but he cannot reject them without presenting clear and convincing reasons for doing so.") (internal citation and quotations omitted). Where a treating physician's opinion conflicts with other medical evidence, the ALJ must set forth specific and legitimate reasons supported by substantial evidence

in the record to reject it. Lester, 81 F.3d at 830; see also McAllister v. Sullivan, 888 F.2d 599, 602-03 (9th Cir. 1989) (remand warranted where ALJ failed to give adequately specific and legitimate reasons for disregarding treating physician's testimony that the claimant was disabled due to personality disorder). The ALJ can meet the requisite specific and legitimate standard "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998). The ALJ "must set forth his own interpretations and explain why they, rather than the [treating] doctors', are correct." Id.

      The record shows that plaintiff first saw Dr. Allen I. Salick, a rheumatologist [see AR at 391], on December 3, 2003. [AR at 391-98, 450.] Thereafter, plaintiff saw Dr. Salick or staff from his office[5] at least once every couple of months between January 2004 and February 2006, and between August and December 2006, and then saw plaintiff again in May 2007, August 2007, and February 2008. [See AR at 255-57, 259-60, 264-66, 268-69, 275-76, 281-84, 294-304, 334-36, 338-39, 341-43, 345-47, 351-54, 356-59, 361-63, 365-68, 370-73, 448-61.] On December 3, 2003, Dr. Salick completed a Comprehensive Rheumtatologic Consultation and Report for plaintiff, in which his objective examination findings included "a metatarsalgic gait," "psoriasis over most of her body including her finger[]nails," "psoriatic plaques on her limbs, trunk, abdomen and back," and "effusions in both knees, worse on the right than the left." [AR 391, 395-96.] He diagnosed her with psoriatic arthropathy and arranged for her to begin receiving Enbrel injections twice a week. [AR at 397.] On January 13, 2004, Dr. Salick examined plaintiff again and noted that "the remission of her psoriasis [has reached] the point where it is only visible in her nails," that she "has improvement in some of the joint pains as well," and that "[h]er main problem right now is the left knee." [AR at 387.] On February 10, 2004, Dr. Salick reported that plaintiff was "doing much better on the Enbrel injections," that "[h]er psoriatic plaques have all improved," and that "her joint

---

    [5] On June 8, 2004, October 19, 2004, November 30, 2004, December 28, 2004, March 9, 2005, June 29, 2005, and September 8, 2005, a physician assistant from Dr. Salick's office saw and examined plaintiff, but Dr. Salick thereafter reviewed the physician assistant's observations and findings, and rendered his own opinions. [See AR at 301-04, 334-36, 341-43, 351-54, 356-59, 361-63, 370-73.] The opinions discussed herein are Dr. Salick's own opinions.

pain has improved and she seems extremely happy on the Enbrel." [AR at 384.] He opined that plaintiff "may continue working in her current capacity." [AR at 385.] On August 25, 2004, Dr. Salick examined plaintiff again and found that she had "only a small psoriatic plaque over the right elbow," and reported that "[t]he effusions in her knees and the widespread psoriasis that she had over much of her body prior to taking Enbrel ... are resolved now." [AR at 366-67.] Nevertheless, he opined that plaintiff is limited to light work. [AR at 367.] From October 2004 to October 2005, Dr. Salick's evaluation notes continued to report that plaintiff was doing well on Enbrel (with the exception of one month beginning in January 2005 when she was without Enbrel for approximately one month [see AR at 341-42]), and opined that she could continue to work. [AR at 298-304, 334-36, 338-39, 341-43, 345-47, 351-54, 356-59, 361-63.] On January 10, 2006, Dr. Salick examined plaintiff again and found that she had psoriasis on her elbows, fingers, and knees, and a "rather large effusion in her knee." [AR at 294-97.] He opined that the psoriasis on her lower extremities was "not under control," and aspirated the effusion on her right knee. [AR at 296.] By February 15, 2006, Dr. Salick reported that plaintiff's psoriasis could "only be seen on the right elbow and one of her fingers" and that the effusion on her right knee was "much smaller than it was but ... still rather large." [AR at 283.] On August 28, 2006, and on October 9, 2006, Dr. Salick examined plaintiff and reported that she had "no active synovitis,"[6] but that her fingers were stiff. [AR at 264-65, 275-76.] On December 13, 2006, Dr. Salick examined plaintiff again, stated that she had active psoriasis on her elbows and one fingernail, and prescribed Cosamine in addition to her existing Enbrel injections. [See AR at 268-69.] On May 8, 2007, Dr. Salick found upon examination that plaintiff had "possible early sausage shaped def[ormity] [in her] left second toe" and stated that her psoriasis was "flaring." [AR at 259-60.] Under his treatment plan notes, he included a CT scan of the chest to rule out "infection on TNF inhibitors,"[7] and noted, "consider

---

[6] Synovitis is defined as "inflammation of a synovium; it is usually painful, particularly on motion, and is characterized by a fluctuating swelling due to effusion within a synovial sac." Dorland's Illustrated Medical Dictionary, at 1773.

[7] Tumor necrosis factor ("TNF") inhibitors block the action of tumor necrosis factor alpha, a cytokine involved in promoting an immune or inflammatory response. See www.drugs.com.

switching to Humira." [AR at 259.] On May 16, 2007, plaintiff underwent CT scans of the chest and of the sacroiliac joint, the results for which were "[n]o abnormalities" and "[n]ormal," respectively. [AR at 321-22.] On August 21, 2007, plaintiff reported to Dr. Salick that she was feeling weak and having more arthralgias,[8] and that her psoriasis was starting up again. Dr. Salick again made a note to "consider switching to Humira." [AR at 256-57.]

On February 27, 2008, Dr. Salick completed a Social Security Disability Evaluation in Rheumatology for plaintiff. [AR at 449-61.] Upon examination, Dr. Salick found that plaintiff had a "bilaterally antalgic gait due to pain in her toes," "problems toe walking," chest expansion of 1 inch where "[i]t should be closer to 2 to 2-1/2 inches," "sausage[]-shaped deformities of the right middle finger, ... right index finger, and ... left middle finger," a grip strength of 10 in both hands where "[n]ormal should be close to 40," "hypoactive deep tendon reflexes" in her lower extremities, "webbed second and third toes bilaterally with questionable sausage[]-shaped deformities," "a synovial thickening and an effusion" on her left lower extremity, and "active Psoriasis over both elbows, in the nails, and in the scalp." [AR 454, 458-59.] He opined that plaintiff "has active Synovitis right now in a number of her joints[,] especially the left knee" and that "she has a very poor endurance for prolonged activity" because of her "active autoimmune disease."[9] [AR at 459-60.] He further opined that plaintiff is "unable to use her hands for anything more than the simplest tasks because of the sausage-shaped deformities and active Arthritis." [AR at 460.] He stated that "[t]he same is true of her shoulders," and that she would therefore "be totally limited, no working whatsoever above shoulder[-]high level with the involvement of her knees and feet, which limit weight bearing to not more than 5 or 10 minutes." [Id.] Dr. Salick further opined that plaintiff "qualifies for a total disability under the social security requirements." [Id.]

The ALJ rejected Dr. Salick's opinions entirely, giving them "no weight" because while Dr. Salick opined that plaintiff "qualifies for a total disability under the social security requirements,"

---

[8] Arthralgia is defined as "pain in a joint." Dorland's Illustrated Medical Dictionary, at 151.

[9] Dr. Salick stated earlier in his report that psoriasis "in and of itself is an autoimmune disease." [AR at 459.]

8

the determination of disability is reserved for the Commissioner, and because the ALJ found that Dr. Salick's statements "are inconsistent with his own observations and opinions." [AR at 21.]

Dr. Salick's opinions regarding plaintiff's work restrictions and the ultimate issue of whether she is disabled conflicted with those of the medical expert, who testified at the May 20, 2009, hearing that plaintiff can perform light work and "has no restriction in the use of her upper or lower extremities." [See AR at 44-45.] Thus, the ALJ was required to give specific and legitimate reasons for rejecting and assigning no weight to Dr. Salick's opinions. See Lester, 81 F.3d at 830. As set forth below, he failed to do so.

While the ALJ correctly stated that the determination of a claimant's ultimate disability is reserved to the Commissioner [see 20 C.F.R. § 404.1527(e)(1)], the ALJ was still required to give specific and legitimate reasons to reject Dr. Salick's opinion that plaintiff is disabled. See McAllister, 888 F.2d at 602-03 (remand warranted where ALJ failed to give adequately specific and legitimate reasons for disregarding treating physician's testimony that the claimant was "fully disabled for employment" due to personality disorder). However, the ALJ merely stated that Dr. Salick's statements were "overstepping his authority as a treating physician," without giving any specific reason to reject this opinion by Dr. Salick. [See AR at 21.] Thus, the ALJ's rejection of Dr. Salick's opinion on the ultimate issue of whether plaintiff is disabled was improper. See McAllister, 888 F.2d at 602-03; Lester, 81 F.3d at 830.[10]

Next, in concluding that Dr. Salick's statements "are inconsistent with his own observations and opinions," the ALJ asserted that: (1) "[plaintiff's] condition is controlled on medication"; (2) her psoriatic arthritis "only appeared to flare [up] after her two pregnancies"; (3) she "was ... release[d] to work full time while on the Enbrel prior to her first pregnancy"; and (4) while Dr. Salick's report "supporting [plaintiff's] disability claim" was dated February 27, 2008, his most recent examination of plaintiff prior to that date was in August 2007.[11] [See AR at 21.] While an ALJ may reject a

---

[10] It does not appear that the ALJ offered this "overstepping" as a reason to reject Dr. Salick's opinions as to plaintiff's functional limitations.

[11] The ALJ stated the "the last recorded examination was in August 2008," but as support
(continued...)

9

treating physician's assessment of a claimant's limitations where that assessment contradicts the physician's own clinical notes and other recorded observations (Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005)), none of the ALJ's explanations for how Dr. Salick's statements "are inconsistent with his own observations and opinions" were supported by substantial evidence.

First, the Court finds that the ALJ's assertion that plaintiff's "condition is controlled on medication" mischaracterizes Dr. Salick's statements in the February 27, 2008, report. In summarizing plaintiff's medical history, Dr. Salick noted that after several years of effectively treating her psoriatic arthritis with Enbrel, plaintiff's condition flared up in May 2007, "represent[ing] a breakdown of the Enbrel," after which Dr. Salick started plaintiff on Humira, which helped her arthritis to "[g]radually ... c[o]me under better control." [AR at 454.] Moreover, while Dr. Salick characterized plaintiff's impairment as "psoriatic arthritis, controlled with TSF inhibitors and NSAID[s]" [AR at 459], his statements in that same report concerning plaintiff's work restrictions do not reflect that he believed that plaintiff's condition was controlled such that she had no functional limitations as a result of her psoriatic arthritis. Rather, Dr. Salick stated that plaintiff "is able to ambulate with weekly injections of Humira" [AR at 454 (emphasis added)], and opined that plaintiff is "unable to use her hands for anything more than the simplest tasks because of the sausage-shaped deformities and active Arthritis," that "[t]he same is true of her shoulders," and that she would therefore "be totally limited, no working whatsoever above shoulder[-]high level with the involvement of her knees and feet, which limit weight bearing to not more than 5 or 10 minutes." [AR at 460.] Thus, the ALJ's conclusion that plaintiff's "condition is controlled on medication" mischaracterized Dr. Salick's statements, which was improper. See Reddick, 157 F.3d at 722-23 (It is impermissible for the ALJ to develop an evidentiary basis by "not fully accounting for the context of materials or all parts of the testimony and reports."); Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (An ALJ is not permitted to reach a conclusion "simply by isolating a specific quantum of supporting evidence.").

---

[11](...continued)
cited an encounter note and a primary treating physician's progress report by Dr. Salick, both dated August 21, 2007. [See AR at 21; 255-57.]

Noting that "Dr. Salick indicated that [plaintiff's] condition was controlled on the medication," the ALJ also pointed out that Dr. Salick nevertheless offered opinions regarding to what extent plaintiff is limited when she is not on the medication, and stated that plaintiff's condition off of the medication "is not a concern because her condition is now controlled." [See AR at 21.] While the ALJ correctly implied that plaintiff's condition when she is <u>not</u> on her medication is not relevant to what she is able to do when she <u>is</u> on her medication, that does not render Dr. Salick's statements regarding what plaintiff can do when she is on her medication "inconsistent with [other] observations and opinions" he made. Moreover, as discussed <u>supra</u>, the ALJ improperly characterized Dr. Salick's statements about plaintiff's condition being "controlled," as opposed to "under better control." Thus, the ALJ's first ground for finding that Dr. Salick's statements "are inconsistent with his own observations and opinions" is not supported by substantial evidence. See <u>Moncada</u>, 60 F.3d at 523.

Second, the ALJ stated that plaintiff's psoriatic arthritis "only appeared to flare up after her two pregnancies." [See AR at 21.] There are two problems with this reason to reject Dr. Salick's opinions. First, even if this statement by the ALJ were true, it is unclear how this would be at all <u>relevant</u> to whether Dr. Salick's statements "are []consistent with his own observations and opinions." The ALJ did not provide any interpretation of this assertion, and thus this statement by him does not constitute a specific and legitimate reason to reject Dr. Salick's opinions. See <u>Reddick</u>, 157 F.3d at 725. Second, it is not fully accurate that plaintiff's psoriatic arthritis "only appeared to flare up after her two pregnancies." While Dr. Salick noted on August 28, 2006, that plaintiff "just delivered [a] baby,"[12] his progress reports on that date and on October 9, 2006, indicated that plaintiff had stiff fingers, but "no active synovitis," and did not note any additional symptoms of her psoriatic arthritis. [See AR at 264-65, 275-76.] The two flare-ups acknowledged

---

[12] This statement by Dr. Salick is consistent with plaintiff's statement in a March 3, 2008, Function Report that she takes care of her "20[-]month[-]old daughter," and plaintiff's husband's statement in a March 12, 2008, Third Party Function Report that plaintiff helps care for their "20 [-]month[-] old." [See AR at 179-80, 188-89.] A child born in August 2006 would have turned 20 months in April 2008, one month after plaintiff and her husband completed their respective function reports.

11

by the ALJ in his decision did not occur until May and August of 2007. [See AR at 20, 255-57, 454.] Thus, the record does not reflect that there was any connection between plaintiff's pregnancy in 2006 and her flare-ups in 2007. Furthermore, the only indication in the record that plaintiff may have been pregnant an additional time between June 30, 2006 (plaintiff's alleged disability onset date) and February 27, 2008 (the date of Dr. Salick's last treating report for plaintiff), is a brief notation in that treating report that plaintiff "was pregnant in 2007." [AR at 454.] However, the Court has found no evidence of when in 2007 plaintiff may have been pregnant, e.g., in early 2007, or as late as December 2007, and thus the ALJ's conclusion that plaintiff's May and August 2007 flare-ups followed a 2007 pregnancy is not supported by substantial evidence. For these reasons, the ALJ's assertion that plaintiff's psoriatic arthritis "only appeared to flare up after her two pregnancies" also does not support his conclusion that Dr. Salick's statements "are inconsistent with his own observations and opinions."

Third, the ALJ stated, citing Dr. Salick's October 25, 2005, progress report, that plaintiff "was also release[d] to work full time while on the Enbrel prior to her first pregnancy." [AR at 21, 323-25.] This statement by the ALJ ignores Dr. Salick's statements in the February 27, 2008, report that there was "a breakdown of the Enbrel" beginning in May 2007, leading him to classify plaintiff as "an Enbrel failure." [See AR at 454.] An ALJ must consider all of the relevant evidence in the record and may not point to only those portions of the records that bolster his findings. See Reddick, 157 F.3d at 722-23; Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984) (error for an ALJ to ignore or misstate the competent evidence in the record in order to justify her conclusion); Day, 522 F.2d at 1156. Thus, the ALJ erred by relying on plaintiff's ability to work while on Enbrel in 2005 to reject Dr. Salick's February 2008 opinions concerning plaintiff's functional limitations.

Finally, the ALJ took issue with the six-month gap between Dr. Salick's February 27, 2008, report and his most recent examination of plaintiff prior to that -- on August 21, 2007. As discussed above, Dr. Salick saw plaintiff in December 2003, either saw plaintiff himself or discussed her condition with his physician assistant once every couple of months between January 2004 and February 2006, saw plaintiff himself once every couple of months between August and December 2006, and also saw plaintiff in May 2007, August 2007, and February 2008.

1  He performed physical examinations on plaintiff, including on February 27, 2008, prescribed her
2  medications, and referred her for CT scans. See 20 C.F.R. § 404.1527(d)(2)(i), (ii) (weight
3  accorded to a treating physician's opinion dependent on length of the treatment relationship,
4  frequency of visits, and nature and extent of treatment received). Based on the length of the
5  treatment relationship and Dr. Salick's experience with plaintiff, Dr. Salick had the broadest range
6  of knowledge regarding plaintiff's physical condition, which is supported by the treatment records.
7  See 20 C.F.R. § 404.1527(d)(2); see also Lester, 81 F.3d at 833 ("The treating physician's
8  continuing relationship with the claimant makes him especially qualified to evaluate reports from
9  examining doctors, to integrate the medical information they provide, and to form an overall
10 conclusion as to functional capacities and limitations, as well as to prescribe or approve the overall
11 course of treatment."). Moreover, the ALJ did not state how the six-month gap between Dr.
12 Salick's August 21, 2007, examination of plaintiff and his February 27, 2008, examination and
13 report demonstrates that Dr. Salick's statements "are inconsistent with his own observations and
14 opinions," and thus this reason does not reach the level of specificity required to reject the opinion
15 of a treating physician. See Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988) (in disregarding
16 the findings of a treating physician, the ALJ must "provide detailed, reasoned and legitimate
17 rationales" and must relate any "objective factors" he identifies to "the specific medical opinions
18 and findings he rejects"); Reddick, 157 F.3d at 725.

19  The ALJ did not provide specific and legitimate reasons supported by substantial evidence
20 to reject Dr. Salick's opinions. Remand is warranted.
21 /
22 /
23 /
24 /
25 /
26 /
27 /
28 /

## VI.

## REMAND FOR FURTHER PROCEEDINGS

As a general rule, remand is warranted where additional administrative proceedings could remedy defects in the Commissioner's decision. See Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir.), cert. denied, 531 U.S. 1038 (2000); Kail v. Heckler, 722 F.2d 1496, 1497 (9th Cir. 1984). In this case, remand is appropriate to properly evaluate Dr. Salick's opinions. The ALJ is instructed to take whatever further action is deemed appropriate and consistent with this decision.

Accordingly, **IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED: March 8, 2012

/s/ - Paul L. Abrams
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE